**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

KARIN L. ANDERSON,                          )
                                            )
                    Petitioner,             )
vs.                                         )
                                            )          Case No. 12-cv-938-DRH-CJP
ANGELA LOCKE,                               )
                                            )
                    Respondent.             )

<u>MEMORANDUM and ORDER</u>

**HERNDON, District Judge:**

Petitioner Karin L. Anderson was convicted of three counts of predatory criminal sexual assault of a child after a bench trial in Saline County, Illinois. Through counsel, she filed a petition for writ of habeas corpus pursuant to 28 U.S.C. §2254.

In her amended petition, Doc. 6, Ms. Anderson asserts the following grounds for habeas relief:

1.  Trial counsel was ineffective in that counsel (1) failed to investigate and present evidence of domestic violence to support a defense of compulsion, including the testimony of a domestic violence expert, (2) failed to present as substantive evidence the victim's prior inconsistent statement, and (3) failed to present evidence that the victim changed her testimony as a result of coaching.

2.  Trial counsel was ineffective in that he failed to present sufficient evidence at the sentencing hearing that petitioner was a victim of domestic violence.

## I. <u>Relevant Facts</u>

This summary of the facts is derived from the detailed descriptions by the Appellate Court of Illinois, Fifth District, in its Rule 23 Orders on direct appeal

and on postconviction proceedings.  Copies of the Rule 23 Orders are attached to Doc. 16 as Exhibits 1 and 2.[1]  The state court's factual findings are presumed to be correct unless rebutted by clear and convincing evidence, which petitioner has not done.  28 U.S.C. §2254(e).[2]

At the time of the crimes, Ms. Anderson was married to James Hargrave, who was a correctional officer employed by the Illinois Department of Corrections. The victim was Ms. Anderson's nine-year-old daughter by a prior marriage, referred to as "K.L.K."  Ms. Anderson and Hargrave both participated in the sexual abuse of K.L.K.

In January, 2005, Ms. Anderson reported to the Illinois State Police that Hargrave had been sexually abusing K.L.K.  She gave the police a videotape depicting sexual acts between Hargrave and K.L.K., as well as a digital memory card containing 79 images of K.L.K. nude and involved in sexual acts with Hargrave.  A detective interviewed Hargrave that day.  Hargrave stated that he and Ms. Anderson had devised a scheme to falsely implicate K.L.K.'s biological father in sexual abuse of K.L.K.  In furtherance of that plan, they decided to "educate" K.L.K. about sex so that she could more convincingly claim abuse by her father.

Hargrave was charged with nine counts arising out of the sexual abuse of K.L.K.  He pleaded guilty to two counts of predatory criminal sexual assault and

---

[1] For ease of reference, the Court uses the document numbers and exhibit designations assigned by the CM/ECF system.

[2] Many, if not most, of the factual allegations set forth in the amended petition are derived from petitioner's affidavit and the report of Dr. Mindy Mechanic.  Both documents were created long after petitioner was convicted and sentenced, and were submitted to the state court in support of her postconviction petition.  These factual allegations are not subject to the presumption of correctness under §2254(e).

one count of aggravated criminal sexual abuse.  Other charges against him were dismissed in exchange for his agreement to testify against Ms. Anderson.

Ms. Anderson was charged by amended information with one count of predatory criminal sexual assault of a child in that she aided and abetted Hargrave in placing his penis in the mouth of K.L.K., one count of predatory criminal sexual assault of a child in that she committed an act of cunnilingus with K.L.K., and one count of predatory criminal sexual assault of a child in that she committed an act of cunnilingus with K.L.K. by allowing K.L.K. to place her mouth on Ms. Anderson's vagina.

Ms. Anderson attempted to plead guilty to these charges, but the judge rejected her plea because she claimed a defense of compulsion.  She then waived her right to a jury trial.

The Appellate Court described Hargrave's trial testimony as follows:

> He and [petitioner] decided to teach K.L.K. sexual behavior and then make accusations against [her father] so that K.L.K. could accurately describe those acts in a courtroom.  [Hargrave] took pictures of K.L.K. and had planned to plant the images in [the father's] home and vehicle.

> [Hargrave] also testified that he observed [petitioner] and K.L.K. perform oral sex on each other. According to [Hargrave], he was only six inches away from them and could see that they were not faking it. . . . Sometime around his forty-first birthday in November 2004, [petitioner] and K.L.K. were both naked in bed with him and took turns performing oral sex on him. [Hargrave] testified that he did not force [petitioner] to participate either by threat or by physical force.

Doc. 16, Ex. 1, p. 6.

The Appellate Court described the victim's trial testimony as follows:

K.L.K. testified that James Hargrave made her perform oral sex on him and that he performed oral and anal sex on her. She testified that when she was first questioned, she did not mention any of the sexual activity with her mother. Later she reported that she and her mother had been naked in bed together and had taken turns performing oral sex on James Hargrave on more than one occasion. K.L.K. admitted that she had told Sergeant Burton that she and her mother had faked oral sex on each other; however, she stated that was a lie. . . .

During cross-examination, K.L.K. testified that she had told Sergeant Burton that James Hargrave had told her that he would take her away from her mother and maybe kill her but that she did not remember that being true and that she had lied and he did not ever tell her that. She further testified that [petitioner] knew about the sexual activity between her and James. She said that her mother knew about it from the beginning. She further testified that she had lied to Sergeant Burton when she told her that [petitioner] had been involved because James had threatened [petitioner] with physical violence if she did not participate. According to K.L.K., [petitioner] had plenty of time to go to the police while James was at work. She admitted that she had lied to Sergeant Burton because she did not want her mom to get into trouble.

Doc. 16, Ex. 1, pp. 6-7.

The Appellate Court described petitioner's trial testimony as follows:

[S]he found out about the sexual activity between James and K.L.K. after Thanksgiving 2004. She became suspicious because James was often alone with K.L.K. and he exhibited deviant sexual behaviors. She testified that during one incident James had forced her and K.L.K. to have oral sex. She explained that James had pressured her their whole marriage to have "threesomes" with other women. According to [petitioner], James had a dream about K.L.K. and he wanted to make it come true. He told her that if she did not participate, he would kill her and K.L.K. and make sure that she and K.L.K. never saw each other again. [Petitioner] described another incident where she and K.L.K. faked oral sex to appease James Hargrave. According to [petitioner], she and K.L.K. faked oral sex. She stated that she did not perform oral sex on K.L.K. and that K.L.K. did not perform oral sex on her.

[Petitioner] then described the plot to fabricate evidence against

[K.L.K.'s biological father]. She said that in late spring of 2004, [Hargrave] wanted to take pictures of K.L.K. and plant them in [K.L.K.'s biological father's] vehicle. [Petitioner] told him that it was a stupid idea. She did not know that he had started taking pictures and had gone through with the plan. She then admitted to witnessing her daughter perform sexual acts on [Hargrave] in December and one other incident where she had faked oral sex with K.L.K.

[Petitioner] admitted that she had known about the sexual abuse for about a month and a half before going to the police on January 18, 2005. She testified that she was afraid to go to the police because James would have killed K.L.K. She claimed that she did not leave with K.L.K. because James was obsessed with her and he would have found her and followed her. According to [petitioner], she did not want her and K.L.K. to live a life where every time the phone rang or somebody knocked at the door they would be scared to death. She wanted K.L.K. to have a normal life.

[Petitioner] denied the allegations against her. She denied that she and K.L.K. performed oral sex on each other. She claimed that she had never done anything willingly. . . . She also denied knowing that the sexual abuse had been going on for several months. She further denied scheming with James to try to frame [K.L.K.'s biological father].

Doc. 16, Ex. 1, pp. 7-8.

Both the state and the defense presented expert evidence. The parties stipulated to the admission as substantive evidence of the report of the state's expert, a psychologist named Dr. Klug. Dr. Klug had evaluated petitioner to determine whether she had "a mental diagnosis and whether she can protect her daughter from abuse." He concluded that petitioner should not have custody of or visitation with her daughter. Doc. 16, Ex. 2, p. 2.

The defense presented the testimony of Dr. Michael Althoff, a forensic psychologist. The Appellate Court described Dr. Althoff's trial testimony as follows:

Dr. Althoff testified that he was hired by the initial defense counsel to evaluate [petitioner] "relative to understanding her behavior with respect to the allegations of certain criminal activity due to the circumstances surrounding her life prior to and during the times that the alleged offenses occurred." Dr. Althoff interviewed [petitioner], reviewed reports, and performed psychological tests. He testified that [petitioner] engaged in dissociative practices typical of those who have experienced trauma. This meant that [petitioner] was unable to experience or express strong emotions. Dr. Althoff stated that there were indications that [petitioner] was also experiencing depression and struggling with intrusive experiences and recollections of distressing past events. Dr. Althoff testified, "[B]asically over the course of their marriage there was the presence of not only physical, psychological, but also sexual abuse." Dr. Althoff commented that Hargrave subjected [petitioner] to engaging in behaviors such as running to the mailbox nude, having sex in public places, and placing pictures of [petitioner] on the Internet. Dr. Althoff testified, "[T]his gradually progressively over the course of time led to his involvement[,] Mr. Hargrave's involvement with his stepdaughter, her daughter, and then eventually culminated in sexual activity involving the daughter participating directly or indirectly."

Doc. 16, Ex. 2, pp. 2-3.

Dr. Althoff performed a number of tests on petitioner, including the Psychological Maltreatment of Woman Inventory.   His testimony continued:

The inventory indicated a significant degree of isolation, domination, verbal abuse, and degradation in [petitioner's] relationship with Hargrave and three previous husbands.

Dr. Althoff diagnosed [petitioner] with posttraumatic stress disorder, chronic in nature and present over the years, and dysthemia, a form of depression that includes long-term feelings of low self-esteem. He also diagnosed [petitioner] with dependent personality disorder, which he described as an enduring pattern of behavior in which she goes to extensive efforts to obtain nurturing from partners, even to the point of being maltreated.

Dr. Althoff concluded that "looking at what happened in a progressive collective kind of way *** [petitioner] felt she had no other choice" but to perform the alleged sexual acts with [K.L.K.]. Dr. Althoff explained that individuals who have been subjected to chronic

> psychological maltreatment over a course of years have their sense of self eroded. This has been termed "psychological death." Dr. Althoff added that he believed that the prolonged victimization that occurred over the years was a significant factor and he stated, "[Petitioner] told me that she felt that she would be killed if she did not subject herself and her daughter in these sexual activities." He continued, "Well, I think that the constant fear that something bad is going to happen to her that may lead to her or her daughter's death was a factor that significantly contributed to what happened."

Doc. 16, Ex. 2, pp. 3-4.

Dr. Althoff also testified that:

> "Well, I was trying to address the issue of, you know, what influenced the defendant to engage in this kind of behavior. And I think the most salient [part] or parts of the conclusion [are] that, number one, [petitioner] has a personality disorder where she's dependent, tends to acquiesce, tends to avoid conflict, tends to seek nurturance from someone even if they are abusing her or treating her in some sort of malevolent way. Number two, [petitioner] had an overly close relationship with [K.L.K.]"

Doc. 16, Ex. 2, p. 4.

## II.  Appeal and Postconviction Petition

On appeal, petitioner argued that the state had not proven beyond a reasonable doubt that she had allowed K.L.K. to perform oral sex on her and her sentence was excessive.  Doc. 16. Ex. 3.  The PLA raised only the sentencing issue.  Doc. 16, Ex. 6.

Petitioner then filed a state postconviction petition alleging ineffective assistance of trial counsel in (1) failing to investigate and call expert and lay witnesses on petitioner's compulsion defense; (2) failing to investigate and call expert and lay witnesses to testify regarding domestic violence as mitigation during sentencing; (3) ineffectively cross-examining three State witnesses; (4)

failing to elicit evidence of compulsion during cross-examination of another State witness; (5) failing to offer evidence to explain why the child victim's testimony at trial differed from her earlier statement; and (6) offering ineffective advice to her regarding her jury waiver, evidentiary questions, and cross-examination.  Doc. 16, Ex. 9, p. 34.  In support of her petition, she produced a report from Dr. Mindy Mechanic, who performed a domestic violence evaluation of petitioner after her trial.   In the course of that evaluation, petitioner remembered incidents of physical and sexual abuse that had been blocked from her memory.  Ex. 9, p. 42. The state petition was filed by attorney Karla Fischer, who initially represented petitioner in this court.  Ex. 9, p. 73.

Petitioner filed a PLA which raised all issues.  Doc. 16, Ex. 15.

### III.   <u>Law Applicable to §2254 Petition</u>

This habeas petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act, known as the AEDPA.   "The Antiterrorism and Effective Death Penalty Act of 1996 modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 122 S.Ct. 1843, 1849 (2002).

Habeas is not yet another round of appellate review.   28 U.S.C. §2254(d) restricts habeas relief to cases wherein the state court determination "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United

States" or "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

A judgment is "contrary to" Supreme Court precedent if the state court "contradicts the governing law set forth in [Supreme Court] cases." *Coleman v. Hardy*, 690 F.3d 811, 814 (7th Cir. 2012), citing *Williams v. Taylor*, 120 S. Ct. 1495, (2000).   A state court decision is an unreasonable application of clearly established law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*   The scope of federal review of state court decisions on habeas is "strictly limited" by 28 U.S.C. § 2254(d)(1).   *Jackson v. Frank*, 348 F.3d 658, 661 (7th Cir. 2003).   The unreasonable application standard is "a difficult standard to meet."   *Id.*, at 662.   Even an incorrect or erroneous application of the federal precedent will not justify habeas relief; rather, the state court application must be "something like lying well outside the boundaries of permissible differences of opinion."   *Id.*, at 662 (internal citation omitted).

### IV. <u>Ineffective Assistance of Counsel</u>

A claim of ineffective assistance of counsel must be analyzed under *Strickland v. Washington*, 104 S.Ct. 2052 (1984).  Analysis under *Strickland* and on habeas review under §2254 are both highly deferential.  Where, as here, both apply, the review is "doubly" deferential.   *Harrington v. Richter*, 131 S.Ct. 770, 788 (2011).  Further, because *Strickland* sets forth a general standard, "the range

of reasonable applications is substantial." *Ibid.*

In order to show ineffective assistance of counsel under *Strickland*, a petitioner must demonstrate (1) that counsel's performance "fell below an objective standard of reasonableness" ("the performance prong"), and (2) "that the deficient performance prejudiced the defense" ("the prejudice prong"). *Strickland*, 104 S. Ct. 2066-2067. In order to be entitled to habeas relief, the petitioner must satisfy both prongs of the *Strickland* analysis. However, there is no mandatory order for the analysis, and a habeas court is not required to address both prongs if the petitioner has failed to make a sufficient showing on one. *Id*. at 2069.

Under *Strickland's* performance prong, a court enquires into "the objective reasonableness of counsel's performance." *Harrington*, 131 S.Ct. at 790. "*Strickland* does not guarantee perfect representation, only a 'reasonably competent attorney.'" *Id*. at 791. There is a strong presumption of adequate assistance and the exercise of reasonable professional judgment to avoid the temptation to second-guess counsel's assistance. *Id*. at 789. Indeed, a petitioner's right to effective assistance of counsel is violated only when counsel's conduct, in light of all the circumstances, "[was] outside the wide range of professionally competent assistance." *Strickland*, 104 S. Ct. at 2066.

With respect to prejudice, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability

sufficient to undermine confidence in the outcome." *Strickland*, 104 S. Ct. at 2068. "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 131 S. Ct. at 792. Ultimately, "[t]he focus of the *Strickland* test for prejudice … is not simply whether the outcome would have been different; rather, counsel's shortcomings must render the proceeding fundamentally unfair or unreliable." *Gray v. Hardy*, 598 F.3d 324, 331 (7th Cir. 2010).

## IV.   Timeliness, Exhaustion and Procedural Default

Respondent concedes that the petition was timely filed, petitioner has exhausted state remedies, and none of her grounds are procedurally defaulted. Doc. 16, p. 21.

## V. Analysis

This court's task is to determine whether the state court's decision was contrary to or an unreasonable application of federal law.   28 U.S.C. §§2254(d)(1).  The relevant state court decision is the decision of the last state court to consider the issues raised in the habeas petition. *Charlton v. Davis*, 439 F.3d 369, 374 (7th Cir. 2006).  Here, that is the decision of the Appellate Court affirming the dismissal of the postconviction petition, attached to Doc. 16 as Ex. 2.

The Court first notes that petitioner suggests that the state court did not reach her claim of ineffective assistance with regard to the failure to present sufficient evidence at sentencing.  She is incorrect.  The Appellate Court found

that there was "no indication that the presentation of additional opinion testimony either from [social worker] Lemmon or from an expert such at Dr. Mechanic would have been of benefit to defendant at the trial or at the sentencing." Doc. 16, Ex. 2, p. 13. The state court concluded that her postconviction petition "lacks an arguable basis in law or fact" and that "counsel's actions fell well within the realm of sound trial strategy." The state court stated that there was no basis for her claim that counsel was ineffective in failing to present additional evidence of abuse "either in the form of evidence of prior instances of abuse or in the form of opinion evidence." Doc. 16, Ex. 2, p. 13.

"By its terms §2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011). The relitigation bar applies even where the state court failed to explain its reasoning, and "whether or not the state court reveals which of the elements in a multipart claim it found insufficient, for §2254(d) applies when a 'claim,' not a component of one, has been adjudicated. " *Ibid*. "[I]neffective assistance of counsel is a single ground for relief no matter how many failings the lawyer may have displayed. Counsel's work must be assessed as a whole; it is the overall deficient performance, rather than a specific failing, that constitutes the ground of relief." *Thompson v. Battaglia*, 458 F.3d 614, 616 (7th Cir. 2006), citing *Peoples v. United States*, 403 F.3d 844, 848 (7th Cir. 2005). All of petitioner's claims were adjudicated on the merits by the state court, and all are therefore subject to the relitigation bar of §2254(d).

The Appellate Court correctly identified *Strickland* as the applicable Supreme Court precedent regarding claims of ineffective assistance, and recognized that the *Strickland* two-pronged test requires a showing of both deficient performance by counsel and resulting prejudice.  Doc. 16, Ex. 2, p. 11.

The question for this Court is not, as petitioner's arguments would suggest, whether it believes that trial counsel was ineffective.  Rather, the "pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington*, 131 S. Ct. at 785.  This Court must ask "whether reasonable jurists could disagree with the state court's *conclusion*, not whether they could disagree over its *reasoning*." *Peterson v. Douma*, 751 F.3d 524, 532 (7th Cir. 2014).

The Supreme Court in *Harrington* emphasized that the unreasonable application standard is a difficult one to meet, by design.  §2254, as amended by AEDPA, "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther." *Harrington*, 131 S. Ct. at 786.  It is within this legal framework that the Court must consider petitioner's claims.

Ms. Anderson first argues that trial counsel did not adequately present her compulsion defense.  In the amended petition and reply, petitioner's counsel presents a comprehensive overview of battered woman syndrome ("BWS") and its relationship to defenses such as self-defense and compulsion.  She cites a number

of cases from various jurisdictions discussing the use of BWS evidence to establish self-defense or compulsion. None of these cases are from the Seventh Circuit Court of Appeals.  Nevertheless, this Court has carefully reviewed and considered the cases cited by petitioner in formulating this Memorandum and Order.

There is a legal problem with petitioner's compulsion defense that petitioner has failed to address.  Under Illinois law, in order to take advantage of the affirmative defense of compulsion, a defendant must admit the acts charged. *People v. Stover*, 415 N.E.2d 25, 28 (Ill. App. 4th Dist. 1980).  At trial, petitioner denied doing the acts charged in counts 2 and 3.  Therefore, she could not raise a compulsion defense as to those counts.  As the trial judge noted at the end of petitioner's testimony, petitioner was "relying on compulsion on one count where she says she did it, but she was compelled to.  The other two [counts] it wouldn't be applicable to."  Doc. 16, Ex. 22, p. 103.  Therefore, the claim that counsel failed to properly present her compulsion defense goes only to the conviction on the first count.

This Court concludes that the state court did not unreasonably apply *Strickland* in rejecting petitioner's ineffective assistance claim.  The state court noted that counsel presented "a theory of compulsion to the trial court that was supported by the extensive opinion testimony of Dr. Althoff.  The trial court rejected this theory based not on a lack of opinion testimony or description of domestic abuse, but on defendant's participation in developing a devious scheme

and her willingness to suborn perjury." Doc. 16, Ex. 2, pp. 13-14. In other words, the trial court concluded that Ms. Anderson's trial testimony was not truthful.

Petitioner has not demonstrated that trial counsel's performance with regard to the presentation of her compulsion defense was deficient, much less that the state court unreasonably applied Supreme Court precedent. This is not a case in which counsel failed to present any evidence of domestic violence or any expert testimony regarding the effects of domestic violence on the defendant. The Appellate Court pointed out that Dr. Althoff testified that there had been "not only physical, psychological, but also sexual abuse" during petitioner's marriage to James Hargrave. Doc. 16, Ex. 2, p. 2. Dr. Althoff testified about specific incidents of abuse that petitioner alleged had been committed by Hargrave on her. He also testified that petitioner "felt she had no other choice" but to perform sex acts with K.L.K., and "she felt that she would be killed" if she did not do so. Doc. 16, Ex. 2, pp. 3-4.

Petitioner argues that using Dr. Althoff rather than a domestic violence expert such as Dr. Mechanic constitutes ineffective assistance. That argument runs afoul of *Hinton v. Alabama*, 134 S.Ct. 1081 (2014). In *Hinton*, defense counsel was unaware that a $1,000.00 limit on the amount the state would pay for a defense expert had been eliminated. Because he incorrectly believed that the funding limit was still in place, he did not seek additional money to pay for a more qualified expert than the one he had retained. The Supreme Court held that

the attorney's failure to seek additional funding because of his mistaken belief constituted ineffective assistance.  However, the Supreme Court cautioned:

> We wish to be clear that the inadequate assistance of counsel we find in this case does not consist of the hiring of an expert who, though qualified, was not qualified enough. The selection of an expert witness is a paradigmatic example of the type of "strategic choic[e]" that, when made "after thorough investigation of [the] law and facts," is "virtually unchallengeable." *Strickland*, 466 U.S., at 690, 104 S.Ct. 2052. We do not today launch federal courts into examination of the relative qualifications of experts hired and experts that might have been hired. The only inadequate assistance of counsel here was the inexcusable mistake of law—the unreasonable failure to understand the resources that state law made available to him—that caused counsel to employ an expert that he himself deemed inadequate.

*Hinton*, 134 S. Ct. at 1089.

The Court also notes that Dr. Mechanic's report contradicts petitioner's trial testimony.  At trial, Ms. Anderson testified that she first suspected that James Hargrave was sexually abusing her daughter sometime after Thanksgiving of 2004, and that K.L.K. first told her of the abuse in December, 2004.  Doc. 16, Ex,. 22, pp. 69-70.  On the other hand, Dr. Mechanic reported that Ms. Anderson told her that she had witnessed Hargrave sexually abusing K.L.K. as early as April, 2004.  Doc. 6, Ex. 8, pp. 33-34.

The state court reasonably concluded that counsel presented sufficient evidence that petitioner suffered abuse from Hargrave.  Petitioner argues that the presentation of more evidence of abuse was necessary to establish a defense of compulsion.  However, as the Appellate Court noted, the trial judge rejected her defense not because of a lack of evidence of abuse by Hargrave, but because there was no evidence that "she was acting under a threat or menace of imminent

infliction of death or great bodily harm."  Doc. 16, Ex. 2, pp. 4-5.

Illinois law requires a threat of *imminent* harm to establish compulsion. 720 ILCS 5/7-1(emphasis added).  "A threat of future injury is not enough to raise the defense of compulsion."  *People v. Scherzer*, 534 N.E.2d 1043, 1057 (Ill. App. 2 Dist. 1989).  "The defense of compulsion requires an impending threat of great bodily harm together with a demand that the person perform a specific criminal act, and a threat of future injury is not enough to raise the defense."  *People v. Humphries*, 630 N.E.2d 104, 111 (Ill. App. 2 Dist. 1994).  The additional evidence that petitioner argues should have been presented would not have established that Hargrave threatened her with imminent harm if she and her daughter did not perform oral sex on him, which is the conduct charged in the first Count.  Notably, petitioner does not allege in her affidavit (Doc. 6, Ex. 1) that Hargrave made a threat of imminent harm on that occasion, and Dr. Mechanic's report (Doc. 6, Ex. 8) does not document that such a threat was made.

In addition, petitioner states in her affidavit that she did not remember all of the physical and sexual abuse perpetrated by Hargrave until she was evaluated by Dr. Mechanic, almost two years after her conviction.  Doc. 6, Ex. 1.  To the extent that her claim rests on counsel's failure to present evidence of abuse that petitioner did not remember at the time of trial, it fails.  Obviously, counsel cannot be faulted for failing to present evidence that he had no reason to know of. *Ruhl v. Hardy*, 743 F.3d 1083, 1094 (7th Cir. 2014).

Petitioner criticizes trial counsel for saying that more evidence of Hargrave's

abuse was not necessary because the judge already knew that she was a victim of domestic abuse and that James Hargrave was a "monster."  In fact, substantial evidence of Hargrave's abuse was presented by way of the testimony of Dr. Althoff, discussed above.  Gary Lemmon, a social worker who performed a sex offender evaluation of petitioner, testified to instances of abuse described by petitioner, including Hargrave putting a gun to her head and threatening to kill her.  See, Doc. 16, Ex. 21, p. 92.  In addition, the same judge presided over petitioner's trial and the case against James Hargrave.  The judge had viewed the videotape, and the photographs of K.L.K. were admitted into evidence at petitioner's trial.

Petitioner also argues that counsel should have presented the victim's prior statement to the police as substantive evidence and should have called witnesses to testify that the victim had been coached to change her testimony.

The Appellate Court concluded that trial counsel's approach in handling the victim's prior inconsistent statement "displayed professional tact" and that petitioner's argument ignored the "potential ramifications" of focusing on the veracity of K.L.K.'s testimony.   Ex. 2, p. 12.   This conclusion is not an unreasonable application of *Strickland*.    There is obvious risk in pursuing a trial strategy that emphasizes attacking the credibility of a ten-year-old victim of sexual abuse.  The state court reasonably deferred to counsel's choice of trial strategy.

Further, the failure to present the prior statement as substantive evidence could not have had any effect on the verdict.  Petitioner's counsel asked questions on cross examination which informed the judge of the contents of the prior

statement.    K.L.K. acknowledged that her testimony differed from her prior statement, and explained the reasons why.    Doc. 16, Ex. 22, pp. 50-63. Accordingly, the admission of the statement as substantive evidence could not have had any effect on the outcome of the trial.

Petitioner's argument that counsel was ineffective in failing to present evidence that the victim was coached to change her testimony is not well-taken because petitioner has not identified any such admissible evidence.  She points to the affidavit of Mr. Lemmon and a letter from Elizabeth Tharp, a counselor who treated the victim.  Mr. Lemmon's affidavit is at Doc. 6, Ex. 2, and Ms. Tharp's letter is at Doc. 6, Ex. 7, pp. 34-35.  These documents do not contain any admissible, first-hand observation of anyone coaching the victim.  Rather, they contain only speculation.    Further, the Illinois Supreme Court has held that "Under Illinois law, it is generally improper to ask one witness to comment directly on the credibility of another witness." *People v. Becker*, 940 N.E.2d 1131, 1143 (Ill. 2010)(internal citations omitted).

Petitioner argues that counsel was ineffective in failing to present additional evidence of Hargrave's abuse of her at sentencing.  Petitioner bears the burden of demonstrating that "there was no reasonable basis for the state court to deny relief." *Harrington*, 131 S. Ct. at 784.  She has not done so here.

The state court could reasonably have determined that, in view of the evidence of domestic abuse that had been presented in the guilt phase, counsel made a strategic choice not to offer additional evidence at sentencing.  Further,

the trial court had already determined that Ms. Anderson's trial testimony was not truthful and that she had jointly conceived of the scheme to "educate" K.L.K. about sex along with Hargrave.   Doc. 16, Ex. 23, pp. 74-78.   Under those circumstances, the presentation of additional evidence of domestic abuse was likely to be perceived as an attempt to paint petitioner as a victim and to escape responsibility for her actions.   In fact, the judge remarked at sentencing that Ms. Anderson had "sought to be treated as a victim" and to establish that she was "not responsible for what has happened."   Doc. 16, Ex. 24, pp. 28-29.

Lastly, petitioner argues that the state court made an unreasonable determination of fact.   The Appellate Court stated that the trial judge was "well aware" that petitioner was a victim of domestic violence.   Doc. 16, Ex. 2, p. 13. Petitioner points out that the trial judge said at sentencing that, in his opinion, petitioner "does not qualify as a battered woman." Doc. 16, Ex. 24, p. 29.   These two statements do not necessarily conflict.   The trial judge's comment came after he observed that petitioner tried to cast herself as a battered woman to show that she was not a "perpetrator" and was not responsible for what happened.   The trial judge's comment can be reasonably interpreted to mean that Ms. Anderson had not succeeded in establishing her compulsion defense, and therefore "does not qualify as a battered woman."

This Court has carefully considered petitioner's arguments.   In view of the doubly deferential standard of review that this Court must employ, this Court must conclude that the state court's decision is a reasonable application of

*Strickland.*

## VI.   <u>Certificate of Appealability</u>

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, this Court must "issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  A certificate should be issued only where the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. §2253(c)(2).

In order for a certificate of appealability to issue, petitioner must show that "reasonable jurists" would find this Court's "assessment of the constitutional claims debatable or wrong."   See, *Slack v. McDaniel*, 120 S.Ct. 1595, 1604 (2000).

Here, no reasonable jurist would find it debatable whether this Court's rulings on the constitutional issues were correct.  Accordingly, the Court denies a certificate of appealability.

## VII.   <u>Conclusion</u>

Karin L. Anderson's amended petition for habeas relief under 28 U.S.C.

§2254 (Doc. 6) is **DENIED**.   This cause of action is **DISMISSED WITH PREJUDICE**.   The Clerk of Court shall enter judgment accordingly.

**IT IS SO ORDERED.**
**Signed this 7th day of November, 2014.**

Digitally signed
by David R.
Herndon
Date: 2014.11.07
16:49:17 -06'00'

**United States District Judge**